IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LORIE M. MOTLEY, ) | |
| ) | 4:10CV3031 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | ORDER |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the plaintiff's application for supplemental security income (SSI) benefits based on disability under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*.[1] The Court has carefully considered the record (AR.) (Filing No. 14) and the parties' briefs (Filing Nos. 21, 26 and 27).

## PROCEDURAL BACKGROUND

The plaintiff, Lorie Marie Motley (Motley), filed her application for disability insurance benefits on January 22, 2007 (AR. 90-94).[2] The Social Security Administration (SSA) denied benefits initially (AR. 48-51) and on reconsideration (AR. 54-57). Motley requested a review and a hearing before an administrative law judge (ALJ) (AR. 58). On April 21, 2009, Motley and vocational expert (VE) Jose Chaparro, appeared and testified at a hearing before ALJ Sharon L. Madsen (AR. 17-36). Motley's attorney also appeared at the hearing. On July 1, 2009, the ALJ issued her written opinion that Motley has not been under a disability since the date of her application was filed, January 22, 2007 (AR. 8-15). On December 11, 2009, the Appeals Council denied Motley's request for review (AR. 1-3). Therefore, the ALJ's July 1, 2009, decision constitutes the Commissioner's final decision subject to judicial review.

---

[1] The parties consented to jurisdiction by a United States Magistrate Judge pursuant to to 28 U.S.C. § 636(c).  **See** Filing No. 18.

[2] The citations to the Administrative Record refer to the page numbers appearing at the bottom right-hand corner.

Motley argues (1) the ALJ improperly discounted the opinions of Motley's nurse practitioner and therapist; and (2) the ALJ's assessment of Motley's residual functional capacity (RFC) with respect to her mental limitations was not supported by substantial evidence.  **See** Filing No. 21 - Brief p. 9.

## FACTUAL BACKGROUND

Motley alleges she has been disabled since May 1, 2006, as a result of bipolar disorder, Post Traumatic Stress Disorder (PTSD), and several physical conditions including back pain and asthma (AR. 21, 90, 103, 133, 147).  Motley was born September 19, 1972, and was 34 years old on her alleged onset date of May 1, 2006, and 36 years old on the date of her hearing before the ALJ (AR. 21).  She attended school through the sixth grade, and later earned her general equivalency diploma (GED) (AR. 22).  Motley has worked sporadically in numerous positions including housekeeper, stocking/retail store employee, and fast food restaurant worker (AR. 23-24, 104).  In her Daily Activities and Symptoms Report completed on February 24, 2007, she described herself as a stay-at-home wife and mother of three young children (AR. 114).

The ALJ's July 1, 2009, decision addresses Motley's claims of both physical and mental impairments (AR. 8-15).  However, in this administrative appeal, Motley challenges only the ALJ's determination of disability with respect to her mental impairments.  Therefore, the court will limit its discussion of the factual background and analysis to Motley's mental impairments and resulting limitations.

### A.    Medical Records

Motley sought out counseling in April 2007 on the advice of an individual, Kara, who performed home visits for the State Ward Department (AR. 196).  On April 26, 2007, Motley completed an intake assessment with Kim Baker, APRN[3] (Ms. Baker), at the Mid-Plains Center (AR. 196-200).  Motley reported suffering from depression all of her life (AR. 196).  She reported feeling depressed and irritable, with her depression causing her to feel

---

[3]Advanced Practice Registered Nurse.

confused (AR. 196). She described "very quick mood changes, from depression to hypomanic," low energy, poor concentration, paranoia, temper tantrums, feelings of helplessness, poor sleep, and nightmares (AR. 196-197). She reported that her husband describes her condition as a double personality (AR. 196). Motley described a history of sexual and emotional abuse and stated she had previously taken medication for depression (AR. 197). Ms. Baker gave Motley an initial diagnosis of bipolar II disorder, and PTSD, with a GAF of 60[4] (AR. 199). Motley presented for the intake assessment appropriately groomed, cooperative and friendly, with broad facial expression, and appropriate behavior during the interview (AR. 199). She was assessed as having logical and goal oriented thought processes, intact memory, good insight and judgment, as well as good concentration and focus (AR. 199). Motley's affect was described as mood congruent, with a "somewhat sad" mood (AR. 199). With respect to Motley's emotional status, Ms. Baker opined "I believe she has a lot of worry and confusion" (AR. 199). Motley was not on any medication at the time of the assessment, but indicated a need for medication and counseling (AR. 199-200). Ms. Baker prescribed Invega, and directed Motley to return in two weeks (AR. 200).

Motley attended a follow-up appointment for medication management with Ms. Baker on May 3, 2007 (AR. 194-195). Motley reported the Invega helped with her mind-racing and she was sleeping well (AR. 194). She described improvement with irritability and anxiety, but stated she was still experiencing some depression (AR. 194). Ms. Baker noted Motley's improved mood, with some remaining depression (AR. 195). Ms. Baker noted Motley's medication compliance and prescribed Paxil in addition to the Invega, and directed Motley to return for a medication check in three to four weeks (AR. 195).

On June 7, 2007, Ms. Baker met with Motley for medication management (AR. 247-248). Motley reported a significant improvement with her depression (AR. 247). However,

---

[4]The Global Assessment of Functioning (GAF) is a clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 30-32 (4th ed. text rev. 2000) (DSM-IV-TR). A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). **See** DSM-IV-TR at 32.

she also reported experiencing anxiety, and a return of her mind-racing and poor sleep, which she attributed to discussions in therapy about her childhood (AR. 247). Ms. Baker noted Motley appeared appropriately groomed and compliant with medication (AR. 248). Ms. Baker increased Motley's Invega and Paxil dosages (AR. 248).

On June 18, 2007, Ms. Baker noted Motley's appropriate grooming and stable mood (AR. 245-246). Motley reported the Invega helped with her anxiety and mind-racing but complained it made her too drowsy and she was unable to get through the day due to the fatigue (AR. 245). Ms. Baker continued the Paxil and slightly decreased Motley's dosage of Invega (AR. 246).

Linda Schmechel, Ph. D. (Dr. Schmechel), a state agency psychologist, reviewed Motley's record and completed forms titled "Mental Residual Functional Capacity Assessment" and "Psychiatric Review Technique" on July 11, 2007 (AR. 203-219). In the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, Dr. Schmechel rated Motley no more than moderately limited in four of twenty listed activities or abilities, and found no significant limitation in the remaining sixteen (AR. 203-204). She determined Motley has no limitations in maintaining social functioning, mild limitations in activities of daily living, moderate limitations in maintaining concentration, persistence or pace, and no episodes of decompensation (AR. 227). In the notes section of the review, Dr. Schmechel wrote "[r]ecords obtained from general care provider show no mental health complaints during routine visits" (AR. 219). Furthermore, during an evaluation on April 26, 2007, Motley "reported a history of medication for depression, but stopped using it on her own" (AR. 219). Dr. Schmechel notes the diagnosis "given by ARPN Baker/Dr. Sood included Bipolar D/O and PTSD" (AR. 219).[5] She notes Motley "continues to use medication, with professed good results," and has not required hospitalization (AR. 219). Motley does not express any concerns about caring for the three young children in her home, and Dr. Schmechel noted there was no indication Motley is unable to care for those children, further commenting:

---

[5]No reference to Dr. Sood appears on the April 26, 2007, Intake Assessment found in the Administrative Record before this court (AR. 196-200).

4

> [Motley] was able to adopt twins, a process that would have required extensive evaluation and requires attending classes, interviews and evaluations, and more home visits. There is no indication that claimant had difficulty obtaining certification as a foster parent or is under any type of censure for problems fulfilling her duties as a foster parent. Typically, children in foster care have additional issues, which make foster parenting a difficult endeavor.

(AR. 219). Dr. Schmechel opined Motley "may have some difficulty with more complicated jobs that require extended concentration on complicated matters. However, based on her home activities, [she] is capable of performing at least simple/unskilled work on a sustained basis" (AR. 219).

Motley's last medication check with Ms. Baker was on August 16, 2007 (AR. 243-244). Motley requested adjustments to her medications, complaining of poor sleep and auditory hallucinations (AR. 243). Motley described hearing voices, sometimes just jumbled words, but also described an incident when the voices told her to put her hand on the fire while she was grilling and cooking dinner for her family (AR. 243). She indicated as a result she was scared, and was not sleeping well (AR. 243). Ms. Baker noted Motley's appearance was appropriate but described her mood as "rather cautious, guarded" (AR. 244). Ms. Baker discontinued the Invega in response to Motley's complaint she was experiencing lactation as a side effect of the medication (AR. 243). Ms. Baker continued the Paxil, and prescribed Seroquel and Trazodone (AR. 244). Motley was told to return for medication management in two weeks, and further advised to seek immediate attention "if her auditory hallucinations worsen or become more fearful for her" (AR. 244).

On October 4, 2007, Motley saw Linda Berry, APRN (Ms. Berry), for medication management at the Mid-Plains Center (AR. 241-242). Ms. Berry noted Motley was pleasant and cooperative but noted her affect was constricted (AR. 241). Motley reported full resolution of her auditory hallucinations and improved sleep with the introduction of Seroquel (AR. 241). However, she complained of physical symptoms including "shakiness when she lies down to sleep at night, increasing headaches, ringing in her ears and soreness at her kidney area" (AR. 241). Ms. Berry advised Motley to see her primary physician to determine whether the physical symptoms might be related to the Seroquel (AR. 242). When Motley returned to see Ms. Berry on October 15, 2007, she reported she

had been successfully treated for a significant kidney infection (AR. 239). Motley indicated the absence of auditory hallucinations and denied depression or significant mood swings (AR. 239). Ms. Berry assessed Motley as stable with no change in her mental status, but also noted Motley's reports of significant fatigue and excessive sleep (AR. 239-240). Ms. Berry continued Motley's Paxil and Seroquel, and began to decrease, then discontinue, the Trazodone (AR. 240).

Motley saw Ms. Berry for a follow-up appointment on November 12, 2007 (AR. 238). Ms. Berry indicates Motley described significant sleep problems with the planned decrease and discontinuation of the Trazodone (AR. 238). The documentation from the appointment is limited, indicating "the patient's notes were inadvertently lost in the process of downloading transcription in to the computer" (AR. 238). The remaining notes list the following current medications: Seroquel, Trazodone, and Paxil (AR. 238).

At her April 14, 2008, appointment with Ms. Berry, Motley reported she was feeling well with improvement in her mood and sleep, less paranoia, and fewer nightmares (AR. 236-237). However, she also reported hearing voices continuously, that worsen when she is angry or upset (AR. 236). Motley explained she "began experiencing auditory hallucinations approximately 8 years ago" and "her different personalities can range from being happy to emotional or mean" (AR. 236). Motley wondered if she had Multiple Personality Disorder, based, in part, on others opinions of her sudden mood swings and "different personalities" (AR. 236). Ms. Berry observed Motley to be pleasant and cooperative with good grooming (AR. 237). Her mood was "somewhat constricted" yet "fairly stable," and her affect was "slightly depressed" (AR. 237). Ms. Berry made no change in Motley's diagnosis but prescribed Abilify to treat her "psychotic symptoms" and instructed her to return in three weeks (AR. 237).

On May 13, 2008, Motley returned to see Ms. Berry for medication management (AR. 234). Motley reported an improvement in the voices, experiencing them more in the background and therefore finding them more manageable (AR. 234). She reported sleeping well and her depression was improved (AR. 234). Ms. Berry increased Motley's Abilify dosage (AR. 235).

Motley called Ms. Berry on July 17, 2008, complaining of an increase in auditory hallucinations and anxiety (AR. 232). "She perceived that the voices were trying to take her over and found that frightful" (AR. 232). Ms. Berry prescribed an additional dose of Seroquel (AR. 232). Ms. Berry saw Motley four days later, on July 21, 2008 (AR. 232). Motley reported her auditory hallucinations had lessened, but she was worrisome and was having difficulty sitting still (AR. 232). Ms. Berry observed Motley's constant leg movement and discussed that medication side effect and others with Motley (TR. 232-233). Ms. Berry instructed Motley to decrease her dosage of Abilify for a week and then discontinue its use (AR. 233).

On October 20, 2008, Ms. Berry saw Motley for medication management however, the second page of documentation is missing from the record (AR. 231). In response to that visit, Ms. Berry changed Motley's diagnosis to Schizoaffective Disorder, Bipolar Type and PTSD, Chronic (AR. 231). Motley reported working two to three hours a day at Subway and described feeling stressed and hearing voices when things were busy on the job (AR. 231). She talked to Ms. Berry about hearing voices as a child and her mother's dismissive reaction (AR. 231). Motley reported "that she did not report her auditory hallucinations previously because she was scared that someone would put her away" (AR. 231). She also mentioned an aunt who has Schizophrenia (AR. 231). Documentation from a later appointment suggests Motley was prescribed Geodon on October 2, 2008 (AR. 229).

On December 1, 2008, Ms. Berry met with Motley for medication management (AR. 227-229). They discussed the recent change to Motley's medications, specifically the addition of Geodon (AR. 229). Motley denied any side effects but reported feeling sluggish during the day (AR. 229). She also reported a resolution of her depression and improvement with her anxiety and related leg movements (AR. 229). Motley reported she continued to have visual hallucinations, seeing people that are not there, and her paranoia had worsened (AR. 229). Ms. Berry increased the Geodon dosage and discontinued Motley's morning dose of Seroquel (AR. 230).

Motley returned to see Ms. Berry two weeks later, on December 16, 2008, complaining of an increase in visual hallucinations and a continuance of auditory

hallucinations (AR. 227). Motley described an increase in the hallucinations when she feels stressed at work and reported telling her employer she could not work full-time (AR. 227). Ms. Berry opined Motley was experiencing an increase in psychosis (AR. 228). Ms. Berry prescribed Invega and directed Motley to decrease her dosage of Geodon over a period of eighteen days before discontinuing its use (AR. 228).

On January 29, 2009, Motley reported an improvement with visual hallucinations, with them occurring only when her stress level is elevated, and a slight improvement with auditory hallucinations (AR. 225). Motley informed Ms. Berry she was experiencing a side effect of taking Invega (lactation), but expressed a preference to continue on the medication due to its ability to control her symptoms (AR. 225). Motley reported working only one and a half to two hours each day, "otherwise it is not manageable to her" (AR. 225). Ms. Berry continued Motley's medications and added Abilify (AR. 224).

On March 11, 2009, Motley saw Ms. Berry for medication management and announced she was ending her employment due to her anxiety causing the auditory hallucinations to intensify at work (AR. 223). She reported she was no longer having visual hallucinations but her auditory hallucinations were continuous, even waking her up during the night (AR. 223). She reported the voices were more manageable when she was under less stress, but indicated she experienced racing thoughts at night (AR. 223). Ms. Berry assessed Motley as stable and continued her medications, suggesting an increased dosage to address the sleep issues (AR. 224).

Ms. Berry completed a Medical Source Statement in April 2009 (AR. 257-262). Ms. Berry indicated she had treated Motley on ten occasions from October 4, 2007, to March 11, 2009 (AR. 257). Ms. Berry listed Motley's diagnosis, signs and symptoms, medications with their side effects, and a current GAF of 50,[6] with the highest GAF in past year being 50 (AR. 257-258). Ms. Berry noted that with medication Motley has attained a "reduction of hallucinations" and her depression is "<u>sometimes</u> manageable" (AR. 259). She indicated Motley's marked limitations in activities of daily living, maintaining social

---

[6]A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). **See** DSM-IV-TR at 34.

functioning, and concentration, persistence or pace, but no episodes of decompensation (AR. 259). Ms. Berry also rated Motley's "mental abilities and aptitude needed to do unskilled work," indicating Motley has no useful ability to function in seven of sixteen areas, seriously limited ability to function in three other areas, and limited but satisfactory ability to function in the remaining six areas (AR. 261). Ms. Berry indicted Motley has no useful ability to function with respect to semiskilled and skilled work (AR. 262). Ms. Berry further described Motley as having limited but satisfactory abilities to interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and use judgment, but no useful ability to function independently (AR. 262).

   Also in April 2009, Motley's therapist, Sandra Eaton, LMHP (Ms. Eaton), completed a Medical Source Statement (AR. 250-255). Ms. Eaton indicated she had treated Motley during 31 sessions from March 3, 2007, to April 15, 2009 (AR. 250). Ms. Eaton listed Motley's diagnosis, signs and symptoms, medications with their side effects, and a current GAF of 50, with the highest GAF in past year being 60 (AR. 250-251). Ms. Eaton noted that with medication Motley was "more functional, less depressed" and had "improved sleep" (AR. 252). She indicated Motley has no limitations in activities of daily living, moderate limitations in concentration, persistence or pace, marked limitations in maintaining social functioning, and one or two episodes of decompensation (AR. 252). Ms. Eaton also rated Motley's "mental abilities and aptitude needed to do unskilled work," indicating Motley has no useful ability to function in eight of sixteen areas, seriously limited ability to function in three other areas, and limited but satisfactory ability to function in the remaining five areas (AR. 254). Ms. Eaton indicted Motley has a range of abilities to function with respect to semiskilled and skilled work (AR. 255). Ms. Eaton further described Motley as having seriously limited abilities to interact appropriately with the general public, use judgment, and function independently; limited but satisfactory abilities to maintain socially appropriate behavior; and more than satisfactory ability to adhere to basic standards of neatness and cleanliness (AR. 255).

**B.     Motley's Testimony**

On April 21, 2009, Motley testified at the administrative hearing before the ALJ (AR. 21-31). She stated she was married and had three children at home, two five-year olds and one ten-year-old (AR. 21-22). She has a sixth grade education but also has a GED (AR. 22). She has a driver's license and drives (AR. 22). She does household chores, including some of the cooking, and can take care of her own personal hygiene (AR. 22-23). She described her typical day as getting her children ready for school, laying down due to her anxiety, then getting up to pick-up around the house and sitting down to read a book (AR. 23). Motley briefly described her previous work experience as part-time employment including Kentucky Fried Chicken and a housekeeping job at a motel (AR. 24). She described her most recent employment as a part-time job at Subway, where she worked eight to ten hours per week (AR. 24, 30). She testified that she tried on two occasions to work more hours but was unable to do so because "my voices came and took over" (AR. 30).

Motley no longer has back or neck pain (AR. 24). She attributed this to injections she received from a specialist eight or nine years ago (AR. 24). Motley's asthma is kept under control with two different medications used on a twice daily, and twice weekly basis (AR. 25). Motley denied any other physical problems (AR. 25).

Motley described experiencing anxiety, depression, paranoia, sleeplessness, nightmares, and memory problems related to her PTSD and bipolar disorder (AR. 25, 28, 29). She also described mood swings, irritability, crying daily, and feelings of hopelessness (AR. 29, 31). She described typical work situations when she felt stressed and had an anxiety attack or was unable to concentrate and pay attention to the task at hand (AR. 26, 31). Motley also testified she hears voices and sees things that are not there (AR. 25). She explained she has heard voices since she was a child, but that they have intensified in adulthood and she now experiences them on a daily basis in response to stress (AR. 25-26). She testified she experiences visual hallucinations when the voices are more intense (AR. 26).

Motley testified she participates in counseling and medication management appointments on a regular basis (AR. 29). Specifically, she listed her medications as

Seroquel, Invega, Paxil and Abilify (AR. 27). She indicated the medications help at night, reducing her racing thoughts (AR. 28). She testified the medications also help with the voices, but that she still hears them though not as loud (AR. 27). She takes some of the medications at night because they make her drowsy (AR. 28). She testified that she used to see Ms. Berry for medication management every month, but now sees her every three months (AR. 29). She previously attended counseling every two weeks, but now attends every three weeks (AR. 29).

### C. Vocational Expert's Testimony

The VE, Jose Chaparro, appeared and testified he had reviewed Motley's work history (AR. 31). The VE described Motley's previous work as a housekeeper/cleaner as light work and unskilled, Specific Vocational Preparation (SVP) level two (AR. 32). The ALJ asked the VE to consider a hypothetical claimant of Motley's age, education, and work background, who has no exertional limitations but who requires asthma precautions and must avoid concentrated exposure to dust, gases and fumes, and who is restricted to simple routine tasks (AR. 32-33). Based on these restrictions, the VE testified such an individual would be capable of performing Motley's past relevant work (AR. 33).

The ALJ then asked the VE for other jobs, given the ALJ's uncertainty that Motley had past relevant work (AR. 33). The VE testified that at the unskilled, light exertional level, the claimant could work in the following positions: cashier with 12,700 jobs existing in Nebraska, and 1,805,000 jobs in the national economy; lunch room or coffee shop counter attendant with 900 jobs existing in Nebraska, and 167,000 jobs in the national economy; and fast food restaurant worker with 11,700 jobs existing in Nebraska, and 1,942,000 jobs in the national economy (AR. 33).

In a second hypothetical, the ALJ asked the VE to consider a hypothetical claimant of Motley's age, education, and work background, who has the following limitations, "medium with 50 and 25, sit/stand/walk 6, asthma, simple routine" (AR. 33). The VE testified that the claimant could do the same jobs as in the first hypothetical (AR. 33). In a third hypothetical, the ALJ asked the VE to consider a hypothetical claimant of Motley's age, education, and work background, who has the following limitations, "medium with 50

and 25, sit/stand/walk 6, asthma, simple routine jobs but also what would be considered a low stress job where you worked . . . at a regular pace or at your own pace" (AR. 33). The VE testified that at the unskilled, medium exertional level, the claimant could work in the following positions:  kitchen helper with 2,200 jobs existing in Nebraska, and 372,800 jobs in the national economy; salvage laborer (sorting recyclables) with 500 jobs existing in Nebraska, and 75,700 jobs in the national economy; and sexton (janitor) with 1,200 jobs existing in Nebraska, and 180,400 jobs in the national economy (AR. 34).  In a fourth, and final, hypothetical, the ALJ asked the VE to add the following restriction to the third hypothetical:  the claimant would miss three to four days per month due to her symptoms (AR. 34).  The VE testified there would be no jobs available (AR. 34).[7]

### THE ALJ'S DECISION

The ALJ concluded Motley has not been disabled under the Act since January 22, 2007, therefore not entitled to disability insurance benefits (AR. 23, 48).  As noted by the ALJ, the Act defines "disability" as an inability to engage in any substantial gainful activity due to any medically determinable physical or mental impairment or combination of impairments (AR. 8).  **See** 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  These impairments must be expected to result in death or must last for a continuous period of at least 12 months.  *Id.*

The ALJ must evaluate a disability claim according to the sequential five-step analysis prescribed by the Social Security regulations.  *Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008); 20 C.F.R. § 404.1520(a)(4).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

---

[7] Motley's attorney posed an additional hypothetical to the ALJ, including additional limitations with respect to attention and attendance, and the ability to follow procedures and make simple decisions, however, the transcript reflects that what was said at this part of the hearing was inaudible (AR. 34-35).

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quotation omitted). More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. See 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984). If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience. See *Braswell*, 733 F.2d at 533. If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy. See *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). A claimant's residual functional capacity is a medical question. See *id.* at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quotation omitted).

In this case, the ALJ followed the appropriate sequential analysis. The ALJ reviewed the record and determined Motley had not engaged in any type of substantial and gainful work activity since January 22, 2007, the application date (AR. 10). Next, the ALJ found Motley had impairments considered severe under the Social Security regulations including: bipolar disorder, post-traumatic stress disorder, and asthma (AR. 10).

At step three, the ALJ found that Motley's medically determined impairments, either singly or collectively, do not equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (AR. 27). Specifically relevant to Motley's appeal, the ALJ determined Motley's mental impairments, either singly or collectively, do not equal the criteria of the listings (AR. 10). The ALJ determined Motley's mental impairments caused mild restrictions in activities of daily living; mild difficulties in maintaining social functioning;

moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation (AR. 11).  Because Motley did not have at least two marked limitations or one marked limitation and repeated episodes of decompensation, the ALJ found the "paragraph B" criteria were not met (AR. 11).  Similarly, the ALJ found the evidence did not establish the presence of "paragraph C" criteria (AR. 11).

The ALJ proceeded to determine Motley's residual functional capacity (RFC) (AR. 11-14).  The ALJ explicitly stated she considered all of Motley's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Rulings (SSR) 96-4p and 96-7p (AR. 11).  The regulations and SSRs cited by the ALJ list factors to consider when determining the claimant's credibility.  The ALJ found that Motley's "medically determinable impairments could reasonable be expected to produce the alleged symptoms, but that [her] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible" (AR. 13).  Specifically, the ALJ noted Motley "has not received treatment consistent with her subjective complaints" (AR. 13).  Moreover, the ALJ noted Motley reported improvement related to her medications with respect to her depression, sleep, and auditory hallucinations, and reported working in December 2008 (AR. 13).

In addition to the findings about Motley's credibility, the ALJ considered the opinions of the professionals who evaluated and treated Motley during the pertinent time period. The ALJ considered the opinions of Ms. Berry and Ms. Eaton as "other sources" pursuant to the guidelines of SSR 06-3p (AR. 41-43).  The ALJ accorded little weight to Ms. Berry's and Ms. Eaton's medical source statements, finding their opinions inconsistent, absent of "specific work-related limitations or the medical evidence to support the cause for the limitations," and not from "acceptable medical sources under Social Security Regulations" (AR. 13-14).

Based on the ALJ's consideration of the record, the ALJ found Motley has the RFC to:

> lift and carry 50 pounds occasionally and 25 pounds frequently, sit, stand, and walk for six hours in an 8-hour day, and should avoid concentrated exposure to dusts, gases, and

>   fumes. She can perform simple routine tasks, low stress jobs,
>   and work at a regular pace with no production goals.

(AR. 11).

At step four, the ALJ found Motley has no past relevant work (AR. 14). At the last step, the ALJ concluded Motley could perform other work existing in significant numbers in the national economy (AR. 14-15). Therefore, the ALJ found Motley is not disabled and has not been under a disability from January 22, 2007, the date her application was filed, through the date of the ALJ's decision (AR. 15).

## STANDARD OF REVIEW

A district court is given jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g). A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). Substantial evidence is defined as less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision. *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010); **see also** *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009) (noting "the 'substantial evidence on the record as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard"). "If substantial evidence supports the decision, then [the court] may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (alteration added). "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." *Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983). The court reviews questions of law de novo. **See** *Miles v. Barnhart*, 374 F.3d 694, 698 (8th Cir. 2004). Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole. **See** *Nettles*, 714 F.2d 835; *Renfrow v. Astrue*, 496 F.3d 918, 920 (8th Cir. 2007). Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578 (**quoting** *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (alteration added)).

## DISCUSSION

### A. Weight of Evidence

Motley contends the ALJ improperly rejected the opinions of her APRN, Ms. Berry, and her therapist, Ms. Eaton, failing to give good reasons for discounting those opinions, and giving preference to the opinion of nonexamining state agency psychologist, Dr. Schmechel. **See** Filing No. 21 - Brief p. 10; Filing No. 27 - Reply p. 7. Motley argues the ALJ should have accorded more weight to the opinions of Ms. Berry and Ms. Eaton because they based those opinions on a series of treatment visits over a period of time, and as such, were "in the best position to offer an opinion as to [Motley's] ability to perform work-related activities on a sustained basis," whereas Dr. Schmechel "had only a small portion of the record available to her." **See** Filing No. 21 - Brief p. 16; Filing No. 27 - Reply p. 7.

The SSA recognizes two types of sources for evidence that may be used as evidence of an impairment or the severity of an impairment: "acceptable medical sources" and "other sources." **See** 20 C.F.R. § 404.1513. Therapists and nurse-practitioners are listed under "other sources" and are not considered "acceptable medical sources." 20 C.F.R. § 404.1513(d)(1); **see also** *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005). An "other source" opinion may by used to show the severity of an impairment and how it affects the individual's ability to function, but may not be used to establish an impairment. **See** 20 C.F.R. § 404.1513; SSR 06-3p. An acceptable medical source that is also a treating source may be entitled to controlling weight. **See** SSR 06-3p. However, "[i]n determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney*, 396 F.3d at 1010 (**citing** 20 C.F.R. § 416.927(d)(4)).

Ms. Phillips, an APRN, and Ms. Eaton, a therapist, do not qualify as acceptable medical sources, nor do their opinions constitute medical opinions under the regulations. **See** 20 C.F.R. § 416.927(a)(2) (defining medical opinions as "statements from physicians and psychologists or other acceptable medical sources"). The ALJ correctly considered Ms. Berry and Ms. Eaton to be "other sources" rather than treating sources or acceptable medical sources. As such, the ALJ is required to consider their opinions when evaluating

the severity of Motley's impairments and the effect her impairments have on her ability to work. **See** 20 C.F.R. § 404.1513; SSR 06-3p. While the ALJ is required to consider the opinions of Ms. Berry and Ms. Eaton, she is not required to accept them or assign them great weight. The ALJ has the discretion to reject or discredit their opinions if they are inconsistent with other evidence in the record. *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006).

Motley saw Ms. Berry regularly for medication management from October 2007 through March 2009; the record includes progress notes from eleven such appointments during that period of time (**see, e.g.**, AR. 223-242). According to her medical source statement, Ms. Eaton saw Motley for 31 therapy sessions from May 2007 through April 2009, although there are no treatment notes from those sessions in the record (AR. 250). Although the ALJ makes reference to the medical source statements provided by both Ms. Berry and Ms. Eaton, the discussion of those opinions is very limited with the ALJ giving them little weight (AR. 13-14). The ALJ explained her decision by pointing out inconsistencies between Ms. Berry's ratings, indicating marked limitations in several areas of functioning, and her statements that Motley's "depression was manageable and hallucinations were reduced" (AR. 14).

The court's review of the record also shows a striking inconsistency between assessments of Motley's restriction of activities of daily living completed within a week of each other, with Ms. Eaton finding no limitation and Ms. Berry finding a marked limitation (AR. 252, 259). Finally, the ALJ correctly noted "Ms. Eaton and Ms. Berry are not acceptable medical sources under Social Security Regulations" (AR. 14). The court finds the ALJ's determination of the relative weight to accord to the opinions of Dr. Schmechel, Ms. Berry, and Ms. Eaton, is supported by substantial evidence on the record as a whole.

### B.    Substantial Evidence - RFC

Motley suggests the ALJ's RFC finding with respect to her mental limitations is not supported by substantial evidence on the record as a whole. **See** Filing No. 21 - Brief p. 9, 17. Motley argues, that by focusing on the physical impairments and largely ignoring her mental impairments, the ALJ's written decision contains very little discussion of the basis

for her RFC finding regarding Motley's mental health limitations. *Id.* at 17. Motley further argues the ALJ's RFC assessment is not supported by substantial evidence as it was based largely on the opinion of a state agency reviewing physician, Dr. Schmechel. *Id.* at 16. Specifically, Motley notes Dr. Schmechel provided an opinion about Motley's functional capacity in July of 2007. *Id.*; **see** AR. 203-219. By virtue of timing, Dr. Schmechel was unable to consider the treatment progress notes of Ms. Berry and the medical source statements of Ms. Berry and Ms. Eaton. **See** Filing No. 20 - Brief p. 14. For these reasons, Motley contends the record lacks substantial evidence to support the RFC finding because it is based only on the opinion of a non-examining physician and not the full record. *Id.* at 17.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations." *Lacroix*, 465 F.3d at 887 (**quoting** *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). "In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003); **see** *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010).

"State agency medical . . . consultants . . . are highly qualified physicians . . . who are also experts in Social Security disability evaluation. Therefore, [ALJs] must consider findings and other opinions of State agency medical . . . consultants . . . as opinion evidence." 20 C.F.R. § 404.1527(f)(2)(i). While "there are circumstances in which relying on a non-treating physician's opinion is proper[,]" generally, "opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Vossen*, 612 F.3d at 1016. An ALJ does not err by considering the opinion of a State agency medical

consultant along with the medical evidence as a whole. *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007).

The ALJ's RFC finding properly included Motley's credible limitations. Motley argues "[t]he mental limitations the ALJ incorporates in her RFC do not reflect [Motley's] limitations as shown by the full record and are not stated in terms of work-related functions as required by SSR 96-8p." **See** Filing No. 21 - Brief p. 20-21. The court agrees with Motley's contention that the majority of the records from her mental health treatment were not available for review when the non-examining medical consultant, Dr. Schmechel, made her findings. In fact, Motley did not report auditory or visual hallucinations to those service providers until after Dr. Schmechel's review. However, Motley incorrectly suggests the ALJ did not consider that later acquired evidence when determining Motley's RFC. The ALJ has a duty to fully and fairly develop a record; however, the she does not have to discuss every piece of evidence presented. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). "Moreover, [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (alteration in original) (**quoting** *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).

Contrary to Motley's argument, the ALJ did consider treatment records relating to Motley's mental health issues that postdated Dr. Schmechel's review. The ALJ described Motley's daily activities by noting, among other things, Motley was working in December 2008 (AR. 13). Additionally, the court's review of the record shows that Dr. Schmechel's July 11, 2007, opinion was consistent with the medical evidence as of that date. In any event, the later medical source statements of Ms. Berry and Ms. Eaton were not entitled to significant weight, as discussed in the previous section, and "the ALJ [is] not obligated to include limitations from opinions [she] properly disregarded." *Wildman*, 596 F.3d at 969.

"Impairments that are controllable or amenable to treatment do not support a finding of disability." *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) (**citing** *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)). The same is true even where the symptoms may sometimes worsen, requiring adjustments in medication as long as the impairment is generally controllable. *Davidson*, 578 F.3d at 846. The highs and the lows associated with Motley's bipolar disorder are apparent in the court's review of the record. However,

the court also notes Ms. Berry fairly consistently assessed Motley as stable with positive responses to her prescribed medications (AR. 223-240).

The ALJ fully and properly evaluated the evidence in the record when determining Motley's RFC.  While Motley may be able to point to evidence that could support a finding of disability, this court "may not reverse [the ALJ's decision] because substantial evidence exists in the record that would have supported a contrary outcome." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).  That is, Motley's RFC, as determined by the ALJ, is the product of the ALJ's responsibility to weigh and reconcile potentially conflicting evidence in the record and the dutiful fulfillment of that role is not to be overturned or superseded by the court.  20 C.F.R. § 416.927(c)(2); *McNamara*, 590 F.3d at 610.  As discussed in detail above,.  Therefore, the court finds that, having properly considered the evidence in the record, sufficient evidence supports the ALJ's findings with respect to Motley's RFC.

## CONCLUSION

For the reasons discussed, the court concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, does not contain the errors alleged by Motley.  Specifically, substantial evidence in the record supports the ALJ's RFC finding with respect to Motley's mental limitations, and the ALJ's decision to give little weight to the opinions of Motley's APRN and therapist.  Substantial evidence in the record as a whole supports the ALJ's denial of benefits.  Accordingly, the Commissioner's decision is affirmed.  Reversal or remand is not warranted.

**IT IS ORDERED** that the decision of the Commissioner is affirmed, the appeal is denied, and a separate Judgment in favor of the defendant will be entered.

DATED this 3rd day of May, 2011.

BY THE COURT:

 s/ Thomas D. Thalken
 United States Magistrate Judge